UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT


Amy J. Burdick,

        Plaintiff,

        v.                              Civil Action No. 2:14-cv-133-wks-jmc

Carolyn W. Colvin, Acting Commissioner
of Social Security Administration,

        Defendant.


## REPORT AND RECOMMENDATION
(Docs. 15, 18)

Plaintiff Amy Burdick brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) under Title XVI of the Social Security Act (SSA), requesting review and remand of the decision of the Commissioner of Social Security denying her application for Supplemental Security Income (SSI).  Pending before the Court are Burdick's motion to reverse the Commissioner's decision (Doc. 15), and the Commissioner's motion to affirm the same (Doc. 18).  For the reasons stated below, I recommend that Burdick's motion be GRANTED, in part; the Commissioner's motion be DENIED; and the matter be REMANDED for further proceedings and a new decision.

**Background**

Burdick was 34 years old on the date she protectively filed her SSI application, November 23, 2010.[1]  (AR 68–69, 184, 251.)  She has a high school education and took courses to become a pharmacy technician but did not complete the program.  (AR 69.)  She has experience working as a baker's helper, a fast food worker, a taxi driver, a production assembler, and a housekeeper.  (AR 83, 226.)  Additionally, as of July 2012, she was babysitting her friend's six-year-old son for four to five hours each week.  (AR 69–70, 76–77.)  During the relevant period, she was living in an apartment with her husband.  (AR 243, 352.)

Burdick has a long history of mental health and substance abuse problems, as well as physical ailments including degenerative disc disease and obesity[2].  Regarding her substance abuse problems, the record reveals that Burdick attended a substance abuse retreat for approximately one week in March 2008, where she attended group therapy and was administered medication for treatment of narcotics abuse.  (AR 465–67.)  The final

---

[1]  A claimant can collect SSI under Title XVI of the SSA only for the period beginning on the month following the date the SSI application was filed, irrespective of the date the claimant alleges his or her disability actually began.  *See* 20 C.F.R. § 416.335 ("When you file an application [for SSI] in the month that you meet all the other requirements for eligibility, the earliest month for which we can pay you benefits is the month following the month you filed the application."); *Perkins v. Chater*, 107 F.3d 1290, 1295 (7th Cir. 1997) ("one can collect SSI under Title XVI only as of the date of application, regardless of how long one may have suffered from a particular infirmity").  Therefore, the relevant disability onset date in this case is November 23, 2010, the date Burdick protectively filed her SSI application, despite her statements in disability forms that her disability began on March 31, 2004 and that she stopped working on June 22, 2006.  (*See* AR 15, 68, 184, 223, 225, 251.)

[2]  Burdick does not contest the ALJ's conclusions regarding her physical impairments; her claim is aimed solely at the ALJ's findings regarding her mental (nonexertional) impairments.  (*See* Doc. 15–1 at 13.)

diagnoses upon discharge include opioid dependence, cannabis dependence, depressive disorder not otherwise specified, and personality disorder not otherwise specified. (AR 466.)  Her condition on discharge was "improved" (*id.*), and she planned to return home to her husband, with follow-up appointments scheduled with her primary care physician, her psychiatrist, and her therapist (AR 467).  It was recommended that she continue attending Alcoholics Anonymous (AA) meetings.  (*Id.*)  In July 2012, Burdick testified that she had been sober for four years and four months.  (AR 74.)

The record reflects that Burdick's mental health problems began at an early age. She was hospitalized for psychiatric difficulties when she was 19 years old and again when she was in her mid-20s.  (AR 350–54, 466.)  In 2008, following her father's death the prior year, she was admitted to the Brattleboro Retreat for 15 days of psychiatric treatment for depression.  (AR 465–66.)  She was discharged with prescriptions for Wellbutrin and Lexapro (antidepressants) and referred to her primary care physician and her psychiatrist for continuing care.  (AR 466–67.)  In December 2010, Burdick began treating with Dr. Mary Jean Sadlak, a psychologist, for individual psychotherapy to address her depression and anxiety.  (AR 498, 622.)  In March 2011, after seeing Burdick five times, Dr. Sadlak listed Burdick's diagnoses as major depressive disorder (recurrent), posttraumatic stress disorder (PTSD), generalized anxiety disorder, and borderline personality disorder.  (AR 489.)  Dr. Sadlak opined that, as a result of these conditions, Burdick's "underlying personality structure" was "very unstable"; she had "very real problems functioning in society"; and she was "not able to work" and "very unlikely . . . [to] be able to work in the foreseeable future."  (AR 490.)

In November 2010, Burdick protectively filed her application for SSI, alleging that she was unable to work due to depression, anxiety, PTSD, borderline personality disorder, bone spurs in her spine, degenerative disc disease, arthritis in her spine, and a herniated disc.  (AR 225, 251.)  She further alleged that her conditions were "exacerbated" by her father's 2007 death.  (*Id.*)  In an updated SSA form, Burdick reported that, starting in June 2011, she did not leave her house except to see her therapist because she was "too scared[] and nerv[ous]."  (AR 264.)  Burdick's application was denied initially and upon reconsideration, and she timely requested an administrative hearing.  The hearing was conducted on July 27, 2012 by Administrative Law Judge (ALJ) Thomas Merrill.  (AR 65–91.)  Burdick appeared and testified, and was represented by an attorney.  A vocational expert (VE) also testified.

At the administrative hearing, Burdick testified that her mental impairments "contribute to [her] being a very inconsistent, nervous wreck."  (AR 71.)  She explained that she has "a lot of comprehension issues," as well as mood swings and "trouble with concentration and decision making, thinking."  (*Id.*)  Burdick further testified that, on a typical day, she sleeps, eats, takes her medication, showers, watches a lot of television, plays games on social media websites, plays with her pets, goes to appointments when she has them, and attends AA meetings when she feels emotionally stable enough to leave the house (two to four times weekly).  (AR 71–72, 75.)  She stated that she goes grocery shopping weekly (AR 73), but ends up postponing the outing once or twice each month because she does not feel "up to it" (AR 74), and is unable to finish her shopping

4

"[p]robably maybe once a month" because of panic attacks (AR 78).  Burdick stated in a Function Report that she also cares for her pets most days, which involves feeding them and sifting the cats' litter box.  (AR 244.)  She further stated that she does "a few" household chores, including putting dishes in the dishwasher twice weekly, vacuuming twice monthly, and doing laundry once weekly; and her husband does "most everything el[se]."  (AR 245; *see* AR 82.)  Nonetheless, Burdick started that "some days [she] ha[s] no interest in anything," and "most days [she] can't get out of bed to get ready for leaving the house."  (AR 247.)

On August 20, 2012, the ALJ issued a decision finding that Burdick was not disabled under the SSA since November 23, 2010, the date her SSI application was filed.  (AR 15–25.)  Thereafter, the Appeals Council denied Burdick's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (AR 1–4.)  Having exhausted her administrative remedies, Burdick filed the Complaint in this action on June 30, 2014.  (Doc. 1.)

## **ALJ Decision**

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380–81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant

has a severe impairment, the third step requires the ALJ to make a determination as to whether that impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).  The claimant is presumptively disabled if his or her impairment meets or equals a listed impairment.  *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the ALJ is required to determine the claimant's residual functional capacity (RFC), which means the most the claimant can still do despite his or her mental and physical limitations based on all the relevant medical and other evidence in the record.  20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1).  The fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  Finally, at the fifth step, the ALJ determines whether the claimant can do "any other work."  20 C.F.R. §§ 404.1520(g), 416.920(g).  The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383; and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's [RFC]").

Employing this sequential analysis, ALJ Merrill first determined that Burdick had not engaged in substantial gainful activity since November 23, 2010, the date she filed

her application.  (AR 17.)  At step two, the ALJ found that Burdick had the following

severe impairments: degenerative disc disease, obesity, affective disorder, anxiety

disorder, substance addiction disorder in sustained remission, and a personality disorder.

(*Id.*)  At step three, the ALJ found that none of Burdick's impairments, alone or in

combination, met or medically equaled a listed impairment.  (AR 17–19.)

Next, the ALJ determined that Burdick had the RFC to perform "light work," as

defined in 20 C.F.R. § 416.967(b), except as follows:

> [Burdick] can frequently climb ramps and stairs, can occasionally climb
> ladders, ropes[,] and scaffolds, can perform unlimited balancing, can
> occasionally stoop, and can perform unlimited kneeling, crouching, and
> crawling.  She can perform unskilled, simple tasks.  She could have routine
> interactions in low[-]stress contexts, with routine but infrequent changes in
> schedules and task demands.

(AR 19.)  Given this RFC, the ALJ found that Burdick was capable of performing her

past relevant work as a fast food worker as the job is actually and generally performed.

(AR 23.)  Alternatively, considering testimony from the VE, the ALJ found that there are

other jobs existing in significant numbers in the national economy that Burdick can

perform, including the following "light" jobs: ticket seller, tape fastener machine

operator, and routing clerk.  (AR 24.)  The ALJ concluded that Burdick had not been

under a disability since November 23, 2010, the date her application was filed.  (AR 25.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." 42 U.S.C. §
423(d)(1)(A). A person will be found disabled only if it is determined that his
"impairments are of such severity that he is not only unable to do his previous work[,] but
cannot, considering his age, education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy." 42 U.S.C. §
423(d)(2)(A).

 In considering a Commissioner's disability decision, the court "review[s] the
administrative record *de novo* to determine whether there is substantial evidence
supporting the . . . decision and whether the Commissioner applied the correct legal
standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*,
221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g). The court's factual review of
the Commissioner's decision is thus limited to determining whether "substantial
evidence" exists in the record to support such decision. 42 U.S.C. § 405(g); *Rivera v.
Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991); *see Alston v. Sullivan*, 904 F.2d 122, 126
(2d Cir. 1990) ("Where there is substantial evidence to support either position, the
determination is one to be made by the factfinder."). "Substantial evidence" is more than
a mere scintilla; it means such relevant evidence as a reasonable mind might accept as
adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971);
*Poupore*, 566 F.3d at 305. In its deliberations, the court should bear in mind that the
Social Security Act is "a remedial statute to be broadly construed and liberally applied."
*Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981).

## Analysis

Burdick claims the ALJ erred in his analysis of the opinions of her treating psychologist, Dr. Sadlak.  Specifically, Burdick argues that the ALJ should have afforded controlling weight to Dr. Sadlak's opinions and that substantial evidence does not support the ALJ's rationale for assigning only limited weight to them.  In response, the Commissioner asserts that the ALJ "properly discussed all medical opinions in crafting a well-supported RFC finding" (Doc. 18 at 16), and properly declined to extend controlling weight to Dr. Sadlak's opinions, providing good reasons for affording them little weight (*id.* at 21).

The SSA recognizes a rule of deference to the medical views of a physician, psychologist, or other "acceptable medical source," as defined in the regulations, who is engaged in the primary treatment of a claimant.  20 C.F.R. §§ 404.1527(a)(2), (c)(2); 416.927(a)(2), (c)(2); *see Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015).  Under the "treating physician rule," "the opinion of a claimant's treating physician[3] as to the nature and severity of the [claimant's] impairment[s] is given controlling weight so long as it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (third alteration in original) (internal quotation

---

[3] Although commonly referred to as the "treating *physician* rule," the rule applies to medical opinions obtained from all "treating source[s]," 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2), which encompasses the opinions of licensed psychologists such as Dr. Sadlak, who are considered "[a]cceptable medical sources" under the applicable regulations, 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).  *See also* 20 C.F.R. §§ 404.1527(a)(2); 416.927(a)(2); *Samuel v. Comm'r of Soc. Sec.*, No. 14 CV 4634(PKC), 2015 WL 5774850, at *14 (E.D.N.Y. Sept. 30, 2015).

marks omitted); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (noting that treating

sources offer a "unique perspective to the medical evidence" that cannot otherwise be

obtained from the record).  Of course, there are circumstances when it is appropriate for

an ALJ to give less than controlling weight to a treating source's opinion.  *See, e.g.*,

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) ("the opinion of the treating

physician is not afforded controlling weight where, as here, the treating physician issued

opinions that are not consistent with other substantial evidence in the record, such as the

opinions of other medical experts").  In those circumstances, SSA regulations require the

ALJ to explicitly consider several factors before determining how much weight the

opinion should receive, including, among others: "(1) the frequen[c]y, length, nature, and

extent of treatment; (2) the amount of medical evidence supporting the opinion;

(3) the consistency of the opinion with the remaining medical evidence; and (4) whether

the physician is a specialist."  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); *see*

20 C.F.R. §§ 404.1527(c)(2)–(6), 416.927(c)(2)–(6).  After considering these factors, "the

ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating

physician's opinion.'"  *Burgess*, 537 F.3d at 129 (quoting *Halloran*, 362 F.3d at 33)

(alteration in original); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("[The

Commissioner] will always give *good reasons* in [the] . . . decision for the weight . . .

give[n] [to the] treating source's opinion.") (emphasis added).  "Failure to provide 'good

reasons' for not crediting the opinion of a claimant's treating physician is a ground for

remand."  *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (quoting *Schaal v. Apfel*,

134 F.3d 496, 505 (2d Cir. 1998) ("the Commissioner's failure to provide 'good reasons'

for apparently affording no weight to the opinion of plaintiff's treating physician

constituted legal error")).

In March 2011, after treating Burdick in five psychotherapy sessions over about a

three-month period, Dr. Sadlak opined as follows:

> My view of [Amy] is that she is actually very vulnerable and in fact,
> disabled.  I base this opinion on her current presentation and on the fact that
> I had the opportunity to do family therapy with her family around 1997
> when Amy was about 21 years old. . . .  Amy's father was a career army
> Vietnam veteran with severe [PTSD] and Bipolar Disorder.  He was
> extremely controlling and critical.  Amy was the primary focus of his
> criticism.  No matter what she did or how she did it, she was told she was
> wrong.  This occurred all day, every[ ]day. . . .  Amy was depressed,
> unstable[,] and rebellious.  Her sense of self was negative and easily
> fragmented.  The ongoing trauma imposed by her father led to self-
> destructive behavior.  Without question, she had developed a severe
> borderline personality disorder.
>
> . . . .
>
> Amy has never recovered from the damaging effects of the abuse by
> her father. . . .  I do believe [she] has come a long way.  She is maintaining
> her sobriety.  She is attempting to commit to her marriage.  She says she is
> working on being "a good person[.]"  However, her underlying personality
> structure is still very unstable.  She remains traumatized and easily
> triggered.  She has poor self-esteem and a poor sense of self.  She is
> vulnerable and unstable.  She has very real problems functioning in society.
> She has a daily struggle with her emotions.  In my opinion, due to the
> enduring and pervasive nature of her depression, anxiety, PTSD, and
> borderline personality disorder, Amy is not able to work.  Moreover, it is
> very unlikely that she will be able to work in the foreseeable future.

(AR 489–90; *see* AR 491–98.)  A little over a year later, in July 2012, after treating

Burdick in 36 psychotherapy sessions, Dr. Sadlak opined in response to interrogatories

prepared by Burdick's attorney that Burdick was "not able to work due to psychotic

disabilities." (AR 623; *see* AR 491–503, 521–40, 568–78.) Dr. Sadlak explained: "Due
to the enduring [and] pervasive nature of her depression, anxiety, PTSD[,] and borderline
personality disorder, Amy Burdick is not able to work. It is unlikely she will be able to
work in the foreseeable future." (AR 624.) Dr. Sadlak assigned Global Assessment of
Functioning (GAF) scores of 40 to Burdick in 2011 and 45 in 2012, both of which
indicate a serious mental impairment. (*Id.*) Specifically, a score of 31–40 indicates
"[s]ome impairment in reality testing or communication (e.g., speech is at times illogical,
obscure, or irrelevant) OR major impairment in several areas, such as work or school,
family relations, judgment, thinking, or mood"; and a score of 41–50 indicates "[s]erious
symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any
serious impairment in social, occupation, or school functioning." *Am. Psychiatric Ass'n,
Diagnostic and Statistical Manual of Mental Disorders (DSM-IV)*, at 32 (4th ed. 2000).
In an accompanying functional capacity assessment, Dr. Sadlak opined that Burdick was
"moderate[ly]" restricted in her ability to understand and remember simple instructions,
carry out simple instructions, and interact appropriately with others; and "marked[ly]"
restricted in her ability to make judgments on work-related decisions, understand and
remember complex instructions, carry out complex instructions, and respond
appropriately to usual work situations and to changes in a routine work setting.
(AR 625–26.) Dr. Sadlak explained that "[a]nxiety, depression, PTSD[, and] Borderline
Personality Disorder all negatively impact [Burdick's] ability to react in normal work
pressure and change"; and that "[a]ttendance, consistent performance[,] and follow

through . . . are . . . negatively [affected] by [Burdick's] unpredictability of mood, motivation[,] and pain[,] as well as memory [and] concentration problems."  (AR 626.) Dr. Sadlak concluded that, due to her mental impairments, Burdick could not manage benefits in her own best interest.  (AR 627.)

   The ALJ gave "limited weight" to Dr. Sadlak's opinions, primarily because he found them "internally inconsistent."  (AR 23.)  The ALJ explained: "[Dr. Sadlak] states that [Burdick] cannot work, but then goes on to identify only moderate limitations in many work-related areas."  (*Id.*)  This finding does not satisfy the requirement that the ALJ must provide "good reasons" for affording limited weight to the opinions of a treating source.  *Snell*, 177 F.3d at 133.  Logically, it is not "internally inconsistent" to say that a claimant has only moderate limitations in many work-related areas but yet still cannot work because she has marked limitations in one or more *other* areas.  This is the situation here: Dr. Sadlak opined that, although Burdick is only "moderate[ly]" restricted in some areas, she is "marked[ly]" restricted in other areas, including her ability to make judgments on work-related decisions, understand and remember complex instructions, and carry out complex instructions.  (AR 625–26.)  There is no requirement that a claimant be markedly limited in *every* area of functioning before receiving disability benefits; rather, the claimant must simply demonstrate that his or her functional limitations preclude substantial gainful employment.  *See Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991) ("To be eligible for disability benefits . . . , a claimant . . . must establish an 'inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.'" (quoting 42 U.S.C. § 423(d)(1)(A))).  Thus, the ALJ's finding that Dr. Sadlak's opinions are internally inconsistent is not a "good reason" for affording limited weight to these opinions.

The ALJ also based his decision to afford only limited weight to Dr. Sadlak's opinions on the ground that they are unsupported, stating: "Dr. Sadlak continually described [Burdick] as having poor concentration and poor memory, but did not explain or support this in any way."  (AR 22.)  The ALJ noted that Dr. Sadlak's treatment notes indicate that Burdick spoke "at length" about her subjective complaints but "there is no information contained therein about [her] being unable to remember or concentrate adequately."  (*Id.*)  Dr. Sadlak–a specialist in adult psychotherapy for the treatment of anxiety, depression, PTSD, and personality disorders, and having treated Burdick for approximately 19 months–consistently stated in treatment notes that Burdick's mood was depressed and anxious; her affect was sad; her thought patterns were negative, obsessive, and avoidant; and her concentration, memory, and judgment were poor or fair.  (*See* AR 491–92, 496–503, 521–40, 568–78.)  As a specialist in the relevant area, Dr. Sadlak was qualified to make these observations about her patient in her treatment notes without specifically connecting them with particular behaviors.  Notwithstanding, Dr. Sadlak did explain the bases for her opinions in her assessment of Burdick's functional limitations, stating for example that "[a]ttendance, consistent performance[,] and follow through all

14

are affected negatively by [Burdick's] unpredictability of mood, motivation[,] and pain[,] as well as [by] memory [and] concentration problems"; and that "[u]npredictable mood [and] motivation are the result of anxiety, depression, PTSD[, and] Borderline Personality [Disorder][; and] [p]oor memory [and] concentration are related to anxiety [and] depression."  (AR 626.)  Thus, the ALJ's finding that Dr. Sadlak's opinions are unsupported is not a "good reason" for affording limited weight to them.

In addition to failing to give good reasons for affording limited weight to Dr. Sadlak's opinions, the ALJ neglected to adequately consider several factors favoring affording more weight to them.  First, as noted above, Dr. Sadlak is a specialist in the relevant medical area: treatment of anxiety, depression, PTSD, and personality disorders. (AR 622; *see* 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5) ("We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").)  Second, Dr. Sadlak had an extensive treatment relationship with Burdick over a significant period of time, seeing Burdick for 36 psychotherapy sessions over a 19-month period.  (AR 491–503, 521–40, 568–78; *see* 20 C.F.R. §§ 404.1527(c)(2)(i), 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").)  Third, and most importantly, Dr. Sadlak's opinions are consistent with other medical opinions contained in the record.  *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.")

Specifically, the diagnoses made by Dr. Sadlak–PTSD, major depressive disorder, generalized anxiety disorder, and borderline personality disorder (AR 623)–are substantially similar to those made by treating psychiatrists Dr. Percy Ballantine and Dr. Catherine Hickey.  In 2008, after treating Burdick during her 15-day psychiatric admission at the Brattleboro Retreat, Dr. Ballantine diagnosed Burdick with a "Depressive Disorder" and a "Personality Disorder," among other ailments, and stated that Burdick's prognosis was "Fair."  (AR 466.)  Dr. Hickey, who treated Burdick from October 2007 until November 2010 (AR 350), diagnosed Burdick with PTSD, generalized anxiety disorder, and borderline personality disorder, among other ailments, in 2007 and again in 2009 (AR 352, 354), and stated in her November 2010 discharge note that Burdick's success in treatment was "[u]p [and] down . . . with stability at times" (AR 350).  Although Dr. Ballantine and Dr. Hickey treated Burdick prior to the application date of November 23, 2010, their treatment notes and opinions are relevant to Burdick's condition during the alleged disability period and to the issue of whether Dr. Sadlak's opinions are consistent with other medical evidence of record.  ALJs "may consider all evidence of record, including medical records and opinions dated prior to the alleged onset date," when, as here, there is no evidence of deterioration or progression of symptoms.  *Pirtle v. Astrue*, 479 F.3d 931, 934 (8th Cir. 2007); *Ward v. Shalala*, 898 F. Supp. 261, 263 (D. Del. 1995) (although "the focus of the inquiry" is the period after the alleged disability onset date, evidence of claimant's condition prior to that date "is to be considered by the ALJ in furtherance of evaluating whether the applicant

16

qualifies for benefits").  The record demonstrates that Burdick's treating psychiatrists and psychologist from before and during the relevant period all concurred that she was emotionally unstable and not mentally capable of sustaining work on a consistent basis.

Burdick's vocational rehabilitation counselor, Donald Wehrung, similarly opined that Burdick was emotionally unstable and unable to work, stating as follows in a January 2011 letter to Disability Determination Services:

> It is my impression in dealing with Amy for the past 20 years in my capacity as a vocational rehabilitation counselor that she is not able to work because of her chronic mental health issues related to her mood disorder. Amy lacks self-confidence and displays very low self-esteem in conjunction with her mood disorder.  She is very anxious about trying new behaviors or challenging herself beyond what she perceives as her very narrowly defined abilities.  She doesn't trust herself or like herself and appears to have trouble maintaining supportive and caring relationships, having recently separated from her husband and remaining very emotionally and financially dependent on her mother.

(AR 255.)  The ALJ gave "little weight" to Wehrung's opinions on the partial grounds that they are "not consistent with the remainder of the evidence of record."  (AR 23.) But, as noted above, Wehrung's opinions are clearly consistent with the opinions of three treating sources–Dr. Sadlak, Dr. Ballentine, and Dr. Hickey.  As a vocational rehabilitation counselor and thus not an "acceptable medical source" under the regulations, Wehrung's opinions are not entitled to the same weight as those of a treating physician or psychologist.  20 C.F.R. §§ 404.1513(a), 416.913(a).  Nonetheless, the ALJ was required to provide a reasonable explanation, considering the regulatory factors, for his decision to afford little weight to Wehrung's opinions.  *See, e.g., Canales v. Comm'r of Soc. Sec.*, 698 F. Supp. 2d 335, 344 (E.D.N.Y. 2010) (citing SSR 06-03p, 2006 WL

2329939, at *2 (Aug. 9, 2006)).  Social Security Ruling 06-03p states that, in addition to evidence from "acceptable medical sources," ALJs may use evidence from "other sources," including rehabilitation counselors, to show the severity of the claimant's impairments and how they affect the claimant's ability to function.  SSR 06-03p, 2006 WL 2329939, at *2.  The Ruling explains: "Often, these sources have close contact with [claimants] and have personal knowledge and expertise to make judgments about their impairment(s), activities, and level of functioning over a period of time."  *Id.* at *3.  Here, Wehrung had this "close contact" with Burdick, observing and working with her in his professional capacity as a vocational rehabilitation counselor for 20 years and reviewing the mental status report of Burdick's treating psychiatric nurse practitioner, Joan Fish, prior to submitting his January 2011 letter.  (AR 255; *see* AR 346–48.)

Not only are Dr. Sadlak's opinions consistent with those of Dr. Ballentine, Dr. Hickey, and counselor Wehrung; they also align somewhat with the May 2011 opinions of nonexamining agency consultant Dr. William Farrell, to which the ALJ afforded "significant weight."  (AR 23; *see* AR 111–12, 114–16.)  Based on his review of the record, Dr. Farrell opined that Burdick was "[m]arkedly limited" in her ability to carry out detailed instructions and interact appropriately with the general public; and "[m]oderately limited" in her ability to maintain attention and concentration, perform activities within a schedule, complete a normal workday and workweek, maintain socially appropriate behavior, and respond appropriately to changes in the work setting. (AR 115–16.)  Dr. Farrell explained that, due to "inherent stress and diminished

capacities w[ith] coping," Burdick was "likely to have difficulty managing intense and frequent changes in schedules and task demands" (AR 116); and due to "mood lability," a "[s]lower pace of activities" would be required and "episodic disruption" would be expected "during periods of situational stresses" (AR 115).

Burdick correctly asserts that the difference between the opinions of Dr. Sadlak and Dr. Farrell is "one of degree, rather than . . . substance." (Doc. 15–1 at 19.) Having never seen or treated Burdick, Dr. Farrell's opinions should not have been given more weight than Dr. Sadlak's without good reason. *See Vargas v. Sullivan*, 898 F.2d 293, 295–96 (2d Cir. 1990) ("The general rule is that . . . reports of medical advisors who have not personally examined the claimant deserve little weight in the overall evaluation of disability.") (internal quotation marks omitted). Also noteworthy, Dr. Farrell made his opinions in May 2011, prior to the creation of Dr. Sadlak's June 2011 through June 2012 treatment notes and July 2012 responses to interrogatories and functional assessment. The Second Circuit has held that, where it is unclear whether an agency consultant reviewed "all of [the plaintiff's] relevant medical information," the consultant's opinion is not supported by the evidence of record, as required to override the opinion of a treating physician. *Tarsia v. Astrue*, 418 F. App'x 16, 18 (2d Cir. 2011). Here, it is clear that agency consultant Dr. Farrell had not reviewed all of the relevant medical information prior to preparing his report. The ALJ at least should have acknowledged this deficiency, noting its effect on the weight afforded to his opinions.

For these reasons, I find that the ALJ erred in his analysis of the opinions of treating psychologist Dr. Sadlak. This error necessarily affected the ALJ's RFC

determination and decision that Burdick could perform her past relevant work and, alternatively, other work existing in significant numbers in the national economy. Thus, Burdick's claim should be remanded to the Commissioner to reweigh the medical opinions and redetermine Burdick's RFC and ability to do her past relevant work or other work. To the extent that the Commissioner is unable to ascertain the basis of the medical opinions, or if the Commissioner finds that the agency consultant opinions might be different in consideration of the subsequent treating and examining provider opinions, the applicable sources or consultants should be recontacted.[4]

### Conclusion

I recommend that Burdick's motion (Doc. 15) be GRANTED, in part; the Commissioner's motion (Doc. 18) be DENIED; and the matter be REMANDED for further proceedings and a new decision in accordance with this ruling.

Burdick requests that, instead of remanding for further proceedings, the Court should reverse and remand solely for payment of benefits. (*See* Doc. 15-1 at 25.)[5] But in cases where there are gaps in the administrative record or, as here, the ALJ has applied an

---

[4] Social Security Ruling 96-5p provides that the ALJ is required to recontact medical sources only when "the evidence does not support a treating source's opinion . . . and the [ALJ] cannot ascertain the basis of the opinion from the case record." SSR 96-5p, 1996 WL 374183, at *6 (1996). The Second Circuit has held that, "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim." *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999) (internal quotation marks omitted); *see Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (no duty to contact treating source for statement, even though record contained no opinions from treating sources). Burdick has demonstrated no obvious gap or other deficiency in the evidence, and thus it should be left to the ALJ to determine on remand whether to recontact Dr. Sadlak or another medical provider or consultant. *See* 20 C.F.R. § 416.920b(c)(1).

[5] Burdick appears to have abandoned this request in her Reply Memorandum. (*See* Doc. 19 at 8.)

improper legal standard, it is more appropriate to remand for further proceedings and a new decision.  *Rosa v. Callahan*, 168 F.3d 72, 82–83 (2d Cir. 1999); *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996).  Thus, Burdick's request that the matter be reversed and remanded solely for payment of benefits should be denied.

      Dated at Burlington, in the District of Vermont, this 17th day of November, 2015.


                                    /s/ John M. Conroy
                                    John M. Conroy
                                    United States Magistrate Judge


Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision."  *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).